UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILIA SANTOS,<br><br>  Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE INC. (OHIO),<br><br>  Defendant. | Case No. 18-cv-03177-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO EXCLUDE; AND DENYING PLAINTIFF'S MOTION TO EXCLUDE**<br><br>Docket Nos. 64, 67, 90 |

Plaintiff Emilia Santos has filed a class action against Defendant United Parcel Service ("UPS") asserting that UPS violated the California Labor Code by failing to provide timely and uninterrupted meal and rest periods to its non-exempt employees, including "Preload Part Time Supervisors" ("Preload PTS"). Ms. Santos alleges that Defendant had a uniform, companywide policy to deprive Preload PTS of rest breaks and force them to record meal breaks which were not actually taken. Currently pending before the Court is Ms. Santos' motion to certify the class. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS in part and DENIES in part** the Motion for Class Certification.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

California Labor Code § 512(a) provides in relevant part that "[a]n employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal break of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent

of both the employer and the employee." Cal. Lab. Code § 512(a). It also provides that "[a]n employer shall not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." *Id.*

In her First Amended Complaint, Ms. Santos alleges that Defendant violates this statute by assigning six-hour shifts and failing to provide timely and off-duty meal periods of 30 minutes, and by instructing Preload PTS to clock out for a meal break between the fourth and fifth hour of the workday without actually taking that meal break. FAC ¶ 16.

The California Labor Code also requires employers to provide their employees with rest breaks. It provides, in relevant part, that "[e]very employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof." *See* Wage Order 4-2001, 8 C.C.R. 11040, § 12(A). Though the term "major fraction" is not defined in the wage order, it "long has been understood—legally, mathematically, and linguistically—to mean a fraction greater than one-half." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1028 (2012).

Ms. Santos alleges that Defendant systematically forced Preload PTS to miss one or more rest breaks, without being paid rest break premiums for each workday the rest break was not provided. FAC ¶ 17. In addition, Ms. Santos alleges that this practice (of not paying rest break premiums) occurred five times per week, with the consent of UPS managers and supervisors. *Id.*

Ms. Santos also provides additional context in her motion for class certification. During "peak season" (*i.e.*, the time between "Black Friday" and early/mid-January), Defendant adequately anticipates increased parcel volume and provides the requisite meal breaks. Mot. at 6. The majority of the alleged labor code violations occur during "non-peak season" (*i.e.*, the rest of the year), when Preload PTS are nominally scheduled for 5.5-hour shifts but are actually expected to work beyond their scheduled shift, for as long as needed to process all packages. Mot. at 6-8.

When class members work beyond their scheduled shifts, Defendant does not consider whether the additional work time requires the provision of a meal break and, in fact, instructs putative class members to record a meal break without taking it. Mot. at 8-10.

As concrete proof of these allegations, Plaintiff's counsel offers the expert declaration of Mr. Bennett S. Berger. Mr. Berger performed an "audit trail" of class members' pay records and concluded that 98.1% of non-peak shifts lasting for more than six hours had a 30-minute meal break, an incredibly high rate of compliance with the meal break law. Berger Decl. ¶ 14(g). Mr. Berger also found that 42% of analyzed shifts did not have a second or third recorded rest break on shifts greater than 6 hours and 10 hours, respectively. *See* Berger Decl. ¶ 13(d), 14(c). Despite this, no employees were paid rest break premiums. Berger Decl. ¶ 17.

As defined in the FAC, the class Ms. Santos seeks to certify consists of "[a]ll current and former non-exempt employees of Defendant, employed in California, who, during the class period [from four years prior to the filing of the Complaint until trial], worked in a distribution center as a part time supervisor, or a position with similar duties and/or job titles, and who has not signed an arbitration agreement with Defendant as of the date of the filing of this Complaint." FAC ¶ 22.

In her motion for class certification, Ms. Santos adds six subclasses to the proposed class definition, consisting of all employees who:

(a) [w]ere not paid for all hours worked, in any pay period that is within the Class Period ("The Unpaid Time Subclass"); and/or

(b) [w]orked more than 5 hours, or more than six hours if subject to a valid first meal break waiver, and/or worked more than 10 hours, or more than 12 hours if subject to a valid second meal break waiver, and were not provided with uninterruptable meal periods of at least 30-minutes ("The Meal Break Subclass"); and/or

(c) [s]igned a meal break waiver when they held a different position than that of a Class Member, and did not sign a new meal break waiver when they changed the position to one of a Class Member ("The Meal Break Waiver Subclass"); and/or

(d) [w]ere not provided uninterruptable rest breaks of at least 10 minutes for each 4 hours of the week ("The Rest Break Subclass"); and/or

3

1     (e)   [w]ere not provided with accurately itemized wage statements listing all hours worked and other information required to be listed under California Labor Code § 226(a) ("The Wage Statement Subclass"); and/or

4     (f)   [w]ere not paid all wages due and owing at the time of their separation ("The Waiting Time Subclass").

Mot. at 13.

Defendant moves to exclude the declaration of Mr. Berger as unreliable and methodologically flawed. Ms. Santos, in turn, moves to strike the declarations from Preload PTS upon which Defendant relies in its opposition to the Motion for Class Certification.

## II. DISCUSSION

### A. Motion for Class Certification

Federal Rule of Civil Procedure 23 governs class actions. Under this rule, a class action may be maintained only if (1) each of the requirements of Rule 23(a) is satisfied and (2) one of the requirements of Rule 23(b) is satisfied. Rule 23(a) provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Ms. Santos seeks to certify this class pursuant to Federal Rule of Civil Procedure 23(b)(3). Mot. at 23. Under Rule 23(b)(3), a class action may be maintained if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings includes:
>
> (A) the class members' interests in individually controlling the

4

>prosecution or defense of separate actions;
>
>(B) the extent and nature of any litigation concerning the controversy already [*42] begun by or against class members;
>
>(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
>(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### 1. Unpaid Time, Meal Break, and Meal Break Waiver Subclasses

To be certifiable, class members' claims must depend upon a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In the wage & hour context, the California Supreme Court has held that "[c]laims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws" are the sort that are routinely certifiable for class treatment. *Brinker*, 53 Cal. 4th at 1033 (emphasis added).

One way of meeting the *Brinker* standard for uniformity is to identify a company policy which is, on its face, unlawful. *See*, *e.g.*, *In re Autozone, Inc.*, No. 10-MD-02159-CRB, 2016 U.S. Dist. LEXIS 105746, at *6-7 (N.D. Cal. Aug. 10, 2016) (finding that plaintiffs "identified an Autozone [rest break] policy, which they represented was in place throughout the class period … [and] [t]hat policy is—on its face—inadequate under *Brinker*"); *Cruz v. Sun World Internat.*, *LLC*, 243 Cal. App. 4th 367, 389 (2015) ("[w]here a written policy that arguably violated the wage laws existed, the [*Brinker*] requirement was met") (internal quotation marks omitted).

Otherwise, putative classes may rely on evidence of a consistently applied policy, *e.g.*, through statistical sampling from a qualified expert witness. To be sure, the degree of consistency (in the absence of a facially unlawful policy) required for class certification has not been clearly identified by the courts and is likely to depend on the circumstances. The California Supreme Court has articulated a procedure whereby that determination should be made: when a trial plan "incorporates representative testimony and random sampling, a *preliminary assessment* should be done to determine the level of variability in the class. If the variability is too great, individual

issues are more likely to swamp common ones and render the class action unmanageable." *Duran v. U.S. Bank National Assn.*, 59 Cal. 4th 1, 33 (2014) (emphasis added). The court may therefore "conduct[] a pilot study or some other type of preliminary assessment" of the plaintiff's sampling analysis to ensure that it is both reliable and probative of a uniform, companywide policy. *Arredondo v. Delano Farms* Co., No. 09-CV-01247-MJS, 2014 U.S. Dist. LEXIS 145562, at *22 (E.D. Cal. Oct. 10, 2014).

Important to such a preliminary assessment is the size of the sample – it cannot be too small. *Duran*, 59 Cal. 4th at 42 (finding a flaw in the "size of the sample group" and holding, in general, that "[t]he more diverse the population, the larger the sample must be in order to reflect the population accurately") (internal citations omitted). The court must "determine that a chosen sample size is statistically appropriate and capable of producing valid results within a reasonable margin of error." *Id.* Further, a sample must be truly random and avoid certain biases, *e.g.*, selection bias (which occurs when members of the sample population are selectively included or excluded based on a nonrandom criterion) and nonresponse bias (which occurs when a sample is chosen randomly from a group containing only survey respondents, thereby increasing the potential for bias because those who did not respond to the survey had no chance of being included within the group). *Id.* at 43.

Here, in response to Plaintiff's discovery request, UPS was ordered to provide a ten-percent sampling of the "contact information, timecards, wage statements, work schedules, electronic device log-in data, and any applicable meal-break waivers" of a putative class of more than 2,000 individuals working at over 80 facilities. *See* Order re: Class Discovery Dispute (Docket No. 60). At oral argument, counsel for Plaintiff noted that it actually had access to about 8% of the putative class, which is more than 100 potential class members. Out of approximately 100 potential class members, counsel submitted the declarations of only nine individuals from 10 facilities. *See* Mot. at 10-12. These nine individuals echo Ms. Santos' allegations: each alleges that they were forced to record meal and rest breaks on their timecards by their Full Time Supervisors, usually during non-peak season, even if such breaks were not actually taken. *See id.* It does not appear that class counsel conducted interviews of Full Time Supervisors, or any

6

1  other UPS employees who supervised Preload PTS, to confirm that this meal break practice
2  existed. And, importantly, Plaintiff did not submit *any* sampling analysis. Instead, Plaintiff's
3  sample (of apparently handpicked examples) likely suffers from selection bias. The miniscule
4  sample size of supportive testimony (nine declarations out of a pool of 100 employees) does not
5  permit an inference of a uniform, companywide policy of meal and rest break violations at UPS, at
6  least in the absence of any systemic practice of such violations. Furthermore, Plaintiff's
7  supporting declarations are contradicted by declarations of numerous Preload PTS and their
8  supervisors. *See*, *e.g.*, Defendant's Compendium of Evidence, Facts 16, 18 (testimony from
9  numerous Preload PTS that (1) their supervisors advise them to take a meal break if the entire
10 Preload runs for more than six hours, and (2) they were never prevented or discouraged, by their
11 supervisors, from taking a first meal period) (Docket No. 81); Decl. of Lisa Stevenson ¶¶ 6, 7
12 (UPS supervisor who states that when Preload PTS work for more than six hours during non-peak
13 season, she either "instruct[s] them to take lunch between their fourth and fifth hour," or "cover[s]
14 their area while they are on lunch," or "tell[s] them to go home before working 6 hours") (Docket
15 No. 76); Decl. of Christine Castaldi-Inman ¶ 7 (human resources employee at UPS who states that
16 "[i]f, occasionally, an employee works longer than six hours without being provided a lunch under
17 UPS's policies, UPS pays the employee one extra hour of pay for the first or second meal period
18 that was not provided. iGate is programmed to flag all non-compliant meal periods") (Docket No.
19 73); Decl. of Gerry Flores ¶ 8 ("[i]t is my practice to instruct Preload PTS to take a 30-minute
20 meal break between their fourth and fifth hour and a second 10-minute rest break after working 6
21 hours and additional breaks as required or needed. If the entire preload will run longer than 6
22 hours, the entire building will shut down for a building meal break") (Docket No. 75).

23 To be sure, Mr. Berger did some statistical analysis. He analyzed a total of 69,061 shifts
24 for 124 UPS employees, comprising 13,630 peak and 55,431 non-peak shifts. Berger Decl. ¶¶ 12,
25 14. With respect to meal breaks, Mr. Berger found that "98.1% of shifts analyzed for the sample
26 class data during non-peak greater than 6 hours had a recorded 1st meal break within the first 5
27 hours and lasting at least 30 minutes in length." Berger Decl. ¶ 14(g). Far from showing that
28 Defendant deprived Preload PTS of meal breaks, this sampling data shows that Defendant actually

7

had a near-uniform policy of *compliance* with the California meal break provisions of the Labor Code. While Plaintiff contends (1) that this compliance rate is not credible and (2) that, if anything, it establishes widespread falsification of meal break records, Plaintiff fails to present any evidence other than the testimony of 9 individuals out of over 2,000 workers of a widespread, consistent practice of such falsification. Plaintiff had ample opportunities to show this via a true sampling analysis but failed to do so. And the counter-declarations which UPS offers, from Preload PTS and their supervisors, show that Preload PTS are consistently provided with the requisite meal and rest break periods when they work longer than six hours (or, if not, they are paid meal break premiums for that missed time).[1]

---

[1] Ms. Santos moves to strike counter-declarations from Preload PTS on two grounds. First, she alleges that defense counsel violated ethical grounds by failing to explain to potential class members that Defendant's interests in this litigation are adverse to their own. *See* Plaintiff's Motion to Strike at 9-10 (Docket No. 90). Second, Ms. Santos alleges that defense counsel's interviews were conducted in a coercive and deceptive manner (*e.g.*, Defendant failed to inform potential class members that a class action concerning their declarations was pending, and that execution of a declaration for Defendant could adversely affect them). *See id.* at 4-9.

Ms. Santos alleges that defense counsel violated California Rule of Professional Conduct 1.13(f), which provides, in relevant part:

> [i]n dealing with an organization's constituents, a lawyer representing the organization shall explain the identity of the lawyer's client whenever the lawyer knows or reasonably should know that the organization's interests are adverse to the constituent(s) with whom the lawyer is dealing.

CAL. RULES OF PROF'L CONDUCT r. 1.13(f).

Ms. Santos also alleges that defense counsel violated California Rule of Professional Conduct 4.3(a), which provides, in relevant part:

> [i]f the lawyer knows or reasonably should know that the interests of the unrepresented person are in conflict with the interests of the client, the lawyer shall not give legal advice to that person, except that the lawyer may, but is not required to, advise the person to secure counsel.

CAL. RULES OF PROF'L CONDUCT r. 4.3(a).

In fact, defense counsel clearly explained its role to potential class members before each interview and did not provide any legal advice. For instance, counsel provided each interviewee with an explanatory document (entitled "Who We Are and Purpose of the Interview") ("WWA Statements") and read the entire document verbatim before the interviews began. Opposition/Response to Plaintiff's Motion to Strike at 2-3 (Docket No. 96). These WWA

8

Because counsel has not offered statistical or other systemic evidence that Defendant engaged in a companywide policy of falsifying meal breaks, the Court therefore finds, in its preliminary assessment, that Ms. Santos has failed to offer proof of a sufficiently uniform, companywide policy with respect to the Unpaid Time, Meal Break, and Meal Break Waiver Subclasses so as to permit class certification under *Duran*.

2. Rest Break and Waiting Time Subclasses

The Industrial Welfare Commission has issued an order on rest breaks, providing, in relevant part:

> Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily *at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof*. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

Wage Order 4-2001, 8 C.C.R. 11040, § 12(A) (emphasis added).

Though not defined in the wage order, the term "major fraction" has been interpreted to mean "a fraction greater than one-half." *See Brinker*, 53 Cal. 4th at 1028. In practical terms, an employee subject to the wage order "would receive no rest break time for shifts of two hours or less, 10 minutes for shifts lasting more than two hours up to six hours, 20 minutes for shifts lasting

---

Statements contained, *inter alia*, disclaimers that the interviewing attorneys represented UPS and not the witness, that participation was completely voluntary, and that the interview related to the present class action (of which the witness was a potential member). *Id.* at 3. Defense counsel confirmed that interviewees were not represented by counsel in this matter and received written confirmation of the same. *Id.* And interviewees were given the opportunity to review written summaries of their interviews (outside the presence of their supervisors) and make changes or corrections before signing the declaration. *Id.*

Additionally, the WWA statement (which every interviewee signed) makes clear that the interviewing attorneys may have interests that are adverse to the employees being interviewed: "I want to make sure you understand that I represent UPS and not you individually. As a potential class member, your interest in the litigation could be adverse to UPS's interests." *Id.* at 8-9; *see also* Declaration of Carlos I. Martinez-Garcia in support of Opposition/Response (Docket No. 99) ("I explained [to the interviewee] that the purpose of obtaining a declaration was to … defend UPS against the allegations made by the Plaintiff … [and] … I never provided any legal advice to any of the interviewees"). The statement also explicitly states that employees would receive no benefit for participating, nor would any action be taken against them. *See* Full and Complete Copy of the WWE Statement, (Docket No. 99, Exhibit A).

9

more than six hours up to 10 hours, and so on." *Id.* at 1029 (emphasis added).

The California Labor Code provides that when "an employer fails to provide an employee a meal or rest or recovery period in accordance with … [an] order of the Industrial Welfare Commission … the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided." Cal. Lab. Code § 226.7(c).

With respect to rest breaks, Mr. Berger found the following: "[o]ut of the 69,061 peak and non-peak shifts analyzed, 27,058 shifts (39.2%) were recorded greater than 6 hours and 1,632 shifts (2.4%) were recorded greater than 10 hours. Out of the 27,058 shifts greater than 6 hours, 10,133 instances did not have a recorded 2nd rest break (37.4%). Out of the 1,632 shifts greater than 10 hours, 1,406 instances did not have a recorded 3rd rest break (86.2%). When combined and only counting one instance per shift maximum, there are 11,336 shifts either greater than 6 hours without a recorded 2nd rest break or greater than 10 hours without a recorded 3rd rest break representing *41.9%* of all shifts greater than 6 hours." Berger Decl. ¶ 14(c) (emphasis added). Based on Mr. Berger's review of the data, there was "no indication … that the defendant was paying any premium payments for rest breaks." Berger Decl. ¶ 17.

Although this showing approaches the kind of systemic evidence necessary to show a consistent practice, Mr. Berger's rest break findings do not carry much probative value because UPS does not require the recording of rest breaks.[2] *See* Opp'n at 24; Castaldi Decl. ¶ 4 ("Preload

---

[2] Defendant contends that Mr. Berger is not a qualified expert because "[h]e pursued no post undergraduate studies" and "has no specialized training related to California meal and rest period law." Memo ISO Defendant's Motion to Exclude Berger Declaration ("Berger Opp'n") at 11. Defendant also attacks Mr. Berger's declaration as (1) based on a flawed methodology that fails to consider meal period waivers that may have exempted putative class members from meal period requirements (Berger Opp'n at 12); (2) based on a flawed application of the law to the facts, because employers are not required to police employees' meal or rest breaks to ensure no work is performed (Berger Opp'n at 13-14); and (3) irrelevant, because it does not speak to a uniform policy of discouraging putative class members from taking meal or rest breaks (Berger Opp'n at 15).

First, Rule 702 does not require post-graduate education as a prerequisite to certification as an expert. *See* Fed. R. Evid. 702 (providing that an individual can qualify as an expert by "knowledge, skill, experience, training, or education …"); *see also Rogers v. Raymark Industries, Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("[a] witness can qualify as an expert through practical experience in a particular field, not just through academic training"). Mr. Berger has

10

1   PTS must accurately record all time they work, including the time they start and stop working and
2   the times they start and end their meal periods, in the PTRS system…[t]he policy does not require
3   Preload PTS to record the start and end of rest breaks"). Contrary to Plaintiff's assertions,
4   Defendant has not admitted in deposition testimony that rest breaks are required to be recorded.
5   Rather, Defendant has merely admitted that "[t]here are rest breaks that are recorded in PTRS."
6   Johnson Decl. at 115 (Docket No. 64-2, Exhibit 4). That admission does not establish that it was
7   UPS's policy to require such recordation, or that such recordation was done consistently as a
8   matter of practice. Although this fact might have been established by a valid sampling study, none
9   was presented by Plaintiff. In fact, Defendant offered numerous counter-declarations from Preload
10  PTS who testified that they are provided with a 10-minute rest break after the first two hours of
11  their shift, another 10-minute rest break on days that they worked more than six hours, and a third
12  10-minute rest break on days that they worked more than 10 hours. *See* Defendant's Compendium
13  of Evidence, Facts 32, 33, 34 (Docket No. 81). Crucially, these same Preload PTS testified that
14  they did not always record their second and third rest breaks. *See id.*, Fact 38.
15      Thus, the statistics cited by Mr. Berger provide limited probative value in demonstrating a
16  pattern of violations; instead, determining the frequency of rest break violations will likely require
17  detailed inquiry and examination of, *e.g.*, timecards of each Preload PTS as well as examination of
18  individual witnesses to determine whether the absence of a rest break was truly indicative of
19  Defendant's failure to authorize and permit such breaks. *Brinker*, 53 Cal. 4th at 1033 ("[a]n
20  employer is required to authorize and permit the amount of rest break time called for under the

---

22  demonstrated that he possesses the skills (*e.g.*, the ability to use formulas and equations to analyze payroll records) and experience (*e.g.*, as a partner and senior data analyst at a consulting group that specializes in this work) to meet this low threshold. *See* Berger Decl. ¶¶ 3-4. Defendant's methodological attack carries more force because Mr. Berger's two central findings (*i.e.*, with respect to meal and rest breaks) are (1) not probative of a uniform, companywide policy of meal break deprivation, and (2) not necessarily probative of a uniform, companywide policy of rest break deprivation (since Preload PTS are not required to record rest breaks).

26  However, the statistical sampling that produced the 41.9% figure (with respect to rest breaks) *could* be corroborated (through, *e.g.*, testimony from Full Time Supervisors) to pass a preliminary assessment under *Duran*. Thus, while Mr. Berger's methodology is not inherently flawed, it lacks probative value given the UPS policy for rest break recordation. Instead of excluding Mr. Berger's findings altogether, the Court will allow Defendant to make these methodological arguments for the trier of fact.

11

wage order for its industry"). The absence of a rest break from a timecard could have a lawful explanation (*e.g.*, the employee took the rest break but merely forgot to record it, since they were not required to) or an unlawful explanation (*e.g.*, Defendant never authorized such rest breaks in the first place).

Counsel for Ms. Santos relies on *Safeway, Inc. v. Superior Court*, 238 Cal. App. 4th 1138 (2015), to argue that "UPS does not have a system/policy to pay – nor does it pay – rest break premiums, which violates California [labor] law." Mot. at 19. At oral argument, counsel explained that the alleged breach of duty is Defendant's establishment of a software system that prevents the California rest break premium statutes from ever being complied with. *See Safeway*, 238 Cal. App. 4th at 1158 (finding that, to demonstrate the propriety of class certification under California's Unfair Competition Law, plaintiffs had to show "deep, system-wide error" in Safeway's system for paying meal and rest break premiums).

The Court does not preclude the possibility that putative classes may rely upon the *Safeway* theory of deep, system-wide error for a showing of classwide certifiability. But in *Safeway*, Plaintiffs offered testimony from supervisory employees (who worked for Defendant) stating that Defendant had no mechanism for paying meal break premiums over a six-year period. *See id.* at 1150 ("Terri Buller, a Vons human resources manager, testified that prior to June 2007, there was no mechanism or procedure by which the premium pay related to meal breaks was calculated or determined when due"). Counsel for Ms. Santos has not offered any statistical evidence which would allow the Court to make the preliminary assessment that such deep, systemic error exists in UPS's timekeeping system which resulted in a pattern of unreported meal and rest break violations. A handful of hand-selected declarations does not suffice, particularly where Defendant offers counter-declarations which tend to show that UPS *did* have a system for monitoring the required meal and rest break periods for Preload PTS.

The Court therefore finds, in its preliminary assessment of Mr. Berger's statistical sampling analysis, that Ms. Santos has failed to offer proof of a uniform, companywide policy with respect to the Rest Break Subclass. Consequently, the Waiting Time Subclass, which is a derivative subclass (*i.e.*, membership in the subclass is contingent upon a finding of certifiability

12

with respect to the Unpaid Time, Meal, and Rest Break Subclasses) is also not certified.

### 3. Wage Statement Subclass

That leaves the Wage Statement Subclass. California Labor Code § 226(a) provides, in relevant part:

> An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and, beginning July 1, 2013, if the employer is a temporary services employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment.

Cal. Lab. Code § 226(a).

Additionally, Wage Order 9 has a section entitled "[r]ecords," which lists information that an employer is responsible for keeping in an accurate manner, including "[t]ime records showing when the employee begins and ends each work period. *Meal periods, split shift intervals and total daily hours worked shall also be recorded*. Meal periods during which operations cease and authorized rest periods need not be recorded." *See* Wage Order 9-2001, 8 C.C.R. 11090, § 7(A)(3) (emphasis added).

Ms. Santos alleges that Defendant violated these statutes by sharing the Meal Break Code with other "Unpaid Work" time in the PTRS. Mot. at 5. Thus, it is impossible for an employee "to confirm from UPS's records if a recording under this code is in fact a meal break, or some other entry. For example, [Santos'] records show instances of 'non work' time exceeding 30 minutes, and it is unknown if this means a meal break, or some other unpaid time." Mot. at 3.

13

1    Additionally, Ms. Santos claims that "meal premium payments are displayed on employee wage statements in a lump dollar sum, and wage statements do not show the hours or number of premiums paid, and corresponding rate." Plaintiff's Memorandum in Reply to Defendant's Objections and Response to Plaintiff's Trial Plan at 9-10 (Docket No. 89).

    Ms. Santos argues that the failure to provide accurate wage statements has two implications. First, it affects the burden-shifting scheme established by the U.S. Supreme Court in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). Mot. at 3. *Mt. Clemens* was a workplace suit, brought by factory employees under the Fair Labor Standards Act, seeking compensation for preliminary activities (*e.g.*, walking to work areas and preparing pottery equipment) that their employer had subtracted from their timecards. *Id.* at 682-85. The Court held that employees could recover damages under the FLSA even where "the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes." *Id.* at 687. In such a situation, an employee meets his burden if he "proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* The burden "then shifts to the employer to come forward with evidence of the precise amount of work performed" or to show that the employee's approximations are inaccurate. *Id.* at 687-88.

    Counsel for Ms. Santos attempts to apply this burden-shifting scheme to missed meal and rest breaks under California labor law by citing Justice Werdegar's concurring opinion in *Brinker*: "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." *Brinker*, 53 Cal. 4th at 1053 (J. Werdegar concurring). This burden shifting, however, would not help Plaintiff with respect to its meal break claim. UPS's records show that meal breaks are uniformly present on putative class members' timecards. The vast majority of analyzed time shifts (98.1%) *did* show a meal break on shifts greater than five hours. As to meal break claims, Justice Werdegar's concurrence in *Brinker* is of no help. The Wage Order does not require recordation of rest breaks. Thus, burden shifting is not mandated, since UPS's timekeeping system is not "inaccurate or inadequate" simply because it does not require that employees record their rest

14

1   breaks.  Moreover, as noted above, there is no evidence of a uniform or even pervasive policy of

2   requiring employees to work through rest breaks and not paying rest break premiums.

3         The second implication of the wage statement violation is more direct.  The failure to

4   provide the requisite specificity can violate the Labor Code and Wage Order.  For purposes of

5   class certification,  whether UPS's time records comply with the Wage Order presents a common

6   question of fact which predominates over individual issues.  The form of the wage statement is

7   uniform for all members of the putative class.  Whether the form is sufficiently clear and specific

8   as to satisfy Labor Code § 226(a) and Wage Order 9 is a matter that can be adjudicated in one

9   stroke.  Plaintiff has offered sufficient evidence on this matter at the class certification stage (*i.e.*,

10  evidence that wage statements of Preload PTS are potentially ambiguous because PTRS does not

11  distinguish between Meal Breaks and other "Unpaid Work" time).  The Wage Statement Subclass

12  is therefore suitable for certification.

13        It remains to be seen how damages will be calculated, on a classwide basis, if the trier of

14  fact finds a uniform practice of ambiguous timecard entries.  Counsel for Ms. Santos should

15  provide a specific trial plan for classwide aggregation of damages for violations of California

16  Labor Code § 226(a) and Wage Order 9.

### III.    CONCLUSION

18  For the foregoing reasons, Ms. Santos' motion to certify the six proposed subclasses is

19  **GRANTED in part and DENIED in part**.  The Court certifies the following subclass only: all

20  employees who were not provided with accurately itemized wage statements listing all hours

21  worked and other information required to be listed under California Labor Code § 226(a) and

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

15

Wage Order 9.  Defendant's motion to exclude the declaration of Mr. Bennett S. Berger is **DENIED**, and Ms. Santos' motion to exclude the declarations of potential class members is **DENIED**.

This order disposes of Docket Nos. 64, 67, and 90.

**IT IS SO ORDERED**.

Dated: November 18, 2020

_____
EDWARD M. CHEN
United States District Judge